GEORGE HAIRSTON, Jr., et al. *v.* RUTH S. HAIRSTON.

In strict legal sense, that place is properly the domicil of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning: — *Held*, that two things must concur to constitute domicil: first, residence; and second, the intention of making it the home of the party.

The time to constitute a domicil may be shorter or longer, according to circumstances; and in all cases the question whether a person has or has not acquired a domicil, must depend mainly upon his actual or presumed intention.

The place where a man carries on his business or professional occupation, and has a home or permanent residence, is his domicil: — *Held*, that its true basis and foundation must be the intention, the *quo animo* of residence; and the apparent or avowed intention of residence, not the manner of it, constitutes domicil.

Where acts, although unaccompanied by declarations, concur with long continued residency or habitancy, evincing an intention of permanent residence, it is manifest that they furnish as satisfactory evidence of such intention as the express declarations of the party to that effect.

Where a party has two residences at different seasons of the year, that will be

esteemed his domicil which he himself selects or describes, or deems to be his home, or which appears to be the centre of his affairs, or where he votes or exercises the rights and duties of a citizen : — *Held*, that the declaration of H., the deceased, that he expected to live and die at his residence in the county of L.; his continued residence for ten years at that place, where a large part of his property was situated, and finally, the exercise of the right of a citizen by voting there, are without doubt conclusive as to his residence.

The legal domicil of the wife is that of her husband.

By the law of Virginia regulating the rights of husband and wife, the husband becomes the absolute owner of the personal property of the wife which is in her possession at the time of the marriage, or which he shall reduce into his possession during its continuance, and the marriage is held to operate as an absolute gift to the husband of all the personal property of the wife. The wife, during the subsistence of the marriage, has no right whatever to the personal property of the husband or any portion of its proceeds or profits.

In that State the husband cannot by a testamentary disposition, to take effect after his death, deprive the wife of her statutory portion of his effects, of which he *may die possessed; and in that respect only does the wife stand on a different or better foundation, than those persons who, as next of kin, would be entitled to the succession as heirs or distributees, in the event the husband should die intestate.

Personal property has no *situs;* and in contemplation of law, it follows the owner, and is subject to the law which governs his person, both with respect to the disposition of it, and its transmission either by succession or the act of the party.

It is the law both of this State and of Virginia, that personal property shall be distributed according to the law of the domicil; and if any tacit contract can be imagined to attach to the fact of marriage as regulated by the law of Virginia, it is that the wife shall be entitled to distribution according to the law of the place in which the husband may have his domicil at the time when he shall die.

On appeal from the probate court of Lowndes county; Hon. N. E. Goodwin, judge of the probate court of Lowndes county.

The opinion of the court contains a statement of the facts of the case.

*F. Anderson* for appellants.

The following points were made by him in the argument of the case : —

1. Which was the domicil of Robert Hairston at the time of his death ? Virginia, or Mississippi ?

2. If he had changed his domicil to Mississippi, does the law

of this State or of Virginia give the rule as to the property acquired in the marital domicil?

On the subject of domicil, see Story's Conflict of Laws, lib. ed. 39, § 41. " In a strict and legal sense, that is properly the domicil of a person, where he has his true, fixed, permanent home and principal establishment, and to which, whenever absent, he has the intention of returning."

By voting, the individual declares nothing more than that he is a citizen of the United States, and has resided in Mississippi for twelve months; and in the case of Robert Hairston, these facts were evident enough without the vote. I presume no case can be found where voting has been considered an evidence of domicil, except in England, or some of the States where an actual domicil is a necessary qualification of the voter. Rev. Const. of Miss. Art. 3; 4 Humph. R. 346.

I admit the residence in Mississippi, which is all that the vote signified, but that residence is only the first step in the establishment of a new domicil; and where there has been another domicil either of origin or choice amounts to nothing, unless there be also shown a fixed determination to make it a permanent home, which is the very point in controversy. I am therefore justified in saying that the fact of voting has no weight whatever, so far as the only point in issue is concerned.

The same may be said of the facts, that on one or two occasions he spoke of the Choctaw Springs in Mississippi as his home, and that in various deeds he is described as of Lowndes county, Mississippi. Undoubtedly, Choctaw Springs was for the time being his home, and he was for the time being of Mississippi, and it needed not either his declaration or the description in the deeds to make these facts apparent. His residence for the time being was of course his home; but the question is, was it his temporary, or permanent home? Had he signified his intention to reside permanently in Mississippi, and to obtain a new domicil? *Horne* v. *Horne*, 9 Ired. R. 99; *Plummer* v. *Brandon*, 5 Ired. Eq. R. 190; 1 Wend. R. 45, 46.

When Hairston left the State of Virginia, it by no means follows that it manifests any intention to adopt Mississippi as his permanent abode; this last fact being entirely dependent on

the circumstances accompanying his residence here. This intention to abandon, either temporarily or permanently, the place of his birth, was manifest from the moment he left there under the influence of unfounded prejudices, but it will be admitted that he then, as far as the proof goes, had no design of establishing a domicil in any particular place. 1 Wend. R. 45, 46; 8 Ib. 134, 135, 139, 140; Story's Confl. of Laws; 1 Hare's Leading Cases, 545, 562; *Somerville* v. *Somerville*, 5 Vesey, 786; *De Bonneville* v. *De Bonneville*, 6 Eng. Eccl. R. 499; *Murray* v. *McCarty*, 2 Munf. 378; *Jennison* v. *Hapgood*, 12 Pick. 77.

We have, then, left as the evidence of Hairston's domicil in Mississippi, the fact of his presence here, and his residence here for the period of ten years. What brought him here? and under what influences did he remain here? It is not pretended that on his first arrival, he came with the intention of establishing a domicil or fixing permanently his residence here from choice; on the contrary, he came as to a place of refuge, where he might escape from the duties and disregard the obligations of a contract which had become onerous to him. His object was to abandon his wife, and he sought a retreat, where she was least likely to follow him, not an abode where he would have chosen to live and die; and it is for this reason that he did not surround himself with any of the comforts of a home, nor seek to accumulate those appliances of luxury and splendor which were within the reach of his wealth, and which he would have desired in a permanent abode.

It is evident, under the English statute, the wife takes only in case of intestacy, and takes as a distributee, under an order of distribution, made by the ordinary, occupying in this respect no higher ground than one of the children or other distributees, whilst in Virginia and Mississippi she does not take under the statute of distributions, nor by virtue of any order of distribution, nor in the same right as the distributees, nor does she take the same interest, but an independent share, which, differing from dower in real estate only, as above pointed out, is allotted to her by the commissioners who are appointed to assign her dower.

If this distinction is well founded, undoubtedly the wife does not take by distribution or succession, for if she did the husband could by will destroy her rights. And the authorities cited by counsel apply only to the distribution of estates, under acts like the English statute of 22 and 23 Charles II. That most of the American States have adopted the provisions of that statute, is stated by Chancellor Kent. 2 Kent's Com. lib. ed. 135.

How, then, does the widow take her share? I think, clearly in virtue of her right as wife or widow, not by virtue of any tacit contract arising out of the matrimonial relation, but by virtue of a right which the law for wise purposes ingrafts upon the institution of marriage; just as the husband possesses *jure mariti* the right of survivorship to the choses in action of his wife, which he takes not by succession or as next of kin; since it cannot be said that in any sense husband or wife are next of kin to each other. 2 Kent's Com. 135, 136; *Watt* v. *Watt,* 3 Vesey, 246, 247; *Garrick* v. *Lord Camden,* 14 Vesey, 381, 382; *Anderson* v. *Dowson,* 15 Vesey, 536, 537; *Bailey* v. *Wright,* 18 Vesey.

Questions of a very analogous nature, and in principle, as I think, incidental, have been much discussed by jurists, and have also gone into judicial decision in the supreme court of Louisiana. In the case of *Saul* v. *His Creditors,* in 17 Martin, or 5 Martin, new series, p. 569, the supreme court of that State, after elaborate investigation, seems to have arrived at the opinion that the law of the matrimonial domicil would prevail in settling the rights of the wife after a dissolution of the marriage as to all property acquired in that domicil, but as to property acquired after a change of domicil the law of the new domicil would prevail, and this opinion of that court was considered by it to be a limitation or restriction of the more general doctrine, maintained by many jurists, that the law of the matrimonial domicil would govern as to all property, whether acquired before or after the change, a limitation which that court imposed on the ground that the law of acquests and gains in Louisiana, in reference to which the contest arose, was a "real" and not a "personal" statute.

This seems to be the established law in reference to the ap-

plication of the law of community, which it may be observed is, in its nature, very similar to the laws of Virginia and Mississippi, in this respect, that the wife's right to a community, like her right to share in the personal estate, arises only after a dissolution of the marriage, during the existence of which the husband has the absolute right of control and alienation. 4 Martin, 648; 5 Ib. 571.

Judge Story recognizes in the Louisiana decisions the clearest and best exposition of the law upon this difficult subject, saying, " That the doctrines maintained in Louisiana will most probably form the basis of the American jurisprudence on this subject." He also lays down amongst propositions which, though " not universally established or recognized in America, have much of domestic authority to sustain them, and none in opposition to them," " that the law of the matrimonial domicil, as to all personal property, when there is no change of domicil, but where there is a change, the law of the actual domicil will govern as to all future acquisitions." Story's Confl. of Laws, § 183–5, &c.

*F. A. Early,* on the same side,
Filed a written argument.

*James T. Harrison* for appellee.
I. As to the question of the domicil of the husband.

Two things must concur to constitute domicil: first, residence; and second, the intention of making it the home of the party. Story's Confl. of Laws, p. 41, § 44.

And if a married man has two places of residence at different times of the year, that will be esteemed his domicil which he himself selects, or describes, or deems to be his home, or which appears to be the centre of his affairs, or where he votes, or exercises the rights and duties of a citizen. Ib. p. 45, § 47; 2 Kent's Com. 431, note, 3d edit.

A citizen living in a State, with all the privileges and immunities of a citizen of that State, ought to share its burdens also, and will be considered, to every purpose, a citizen. Accordingly, the universal understanding and practice of America is, that a

citizen of the United States, residing permanently in any State, is a citizen of that State. *Prentiss' Trustee* v. *Barton's Executors*, 1 Brock. 391; *Lessee* v. *Cooper & Galbraith*, 3 Wash. C. C. R. 553, 554; *Read* v. *Bertrand*, 4 Ib. 516.

Under the constitution of the United States, a citizen of any one State becomes a citizen of any other in which he permanently resides. *Rogers* v. *Rogers*, 1 Paige, 184.

A citizen of the United States, residing in any State of the Union, is a citizen of that State. *Sassias* v. *Ballou*, 6 Peters, 762.

Fewer circumstances are necessary to constitute domicil in case of native subjects than foreigners. 1 Gallison, 286.

It seems very clear that an individual permanently residing and domiciled here, and who is entitled to all the privileges and immunities of citizens of this State, cannot be regarded otherwise than as a citizen of the State. *Towler's case*, 5 Leigh, 749.

The rights of election and representation cannot be imparted to any but citizens without a subversion of the principles of the social compact. *Murray* v. *McCarty*, 2 Munf. R. 398.

On a change of domicil from one State to another, citizenship may depend upon the intention of the individual. But this intention may be shown more satisfactorily by acts than declarations. An exercise of the right of suffrage is conclusive upon the subject. *Shelton* v. *Tiffin et al.*, 6 How. U. S. R. 163.

Our constitution provides: That every free white male person, of the age of twenty-one years or upwards, who shall be a citizen of the United States, and shall have resided in this State one year, &c., shall be entitled to vote. Constitution of Mississippi, art. 3, § 1.

And no person shall be a representative unless he be a citizen of the United States, and shall have been an "inhabitant" of this State two years next preceding his election. Constitution of Mississippi, art. 3, § 7.

I presume that both the voter and representative, the resident and the inhabitant, would be considered citizens of Mississippi, to all intents and purposes.

In *Guier* v. *O'Daniel*, 1 Binney, 354, the court say: "Yet it appears that Guier was present at one election, and offered his ticket, and though not received, it was a striking fact to show he considered himself in the light of a citizen." 1 Binney, 354.

The possession and exercise of political rights have uniformly been considered as strong tests of domicil by the Roman law, and by the civilians ; but these circumstances have had perhaps less weight given them in England than in continental Europe. Phillimore on Domicil, 131, 132 ; 32 Law Lib. 88, 4th series.

In this country there is but one opinion upon the subject, that ever I have met with. Citizens are necessarily inhabitants. *Harvard College* v. *Gore,* 5 Pick. R. 373.

Habitancy is a more comprehensive term than domicil. *Lyman* v. *Fisk,* 17 Pick. R. 234.

In general terms, one may be designated as an inhabitant of that place which constitutes the principal seat of his, residence, of his business, pursuits, connections, attachments, and of his political and municipal relations. It is manifest, therefore, that it embraces the fact of residence at a place, with the intent to regard it and make it his home. *Lyman* v. *Fisk,* 17 Pick. R. 234 ; *Abington* v. *North Bridgewater,* 23 Ib. 177, 178.

In some respects, perhaps, there is a distinction between habitancy and domicil, as pointed out and explained in the case of *Harvard College* v. *Gore,* 5 Pick. R. 377, the former being held to include citizenship and municipal relations. *Lyman* v. *Fisk,* 17 Pick. R. 234.

In America, owing probably to the habit of the country, little if any stress seems to have been laid upon the fact of the person being only a trader, or lodger at a place. On a question of domicil, it was said, by President Rush, the mode of living is not material, whether on rent at lodgings, or in the house of a friend. The apparent, or avowed intention of constant residence, not the manner of it, constitutes the domicil. Phillimore on Domicil, 112 ; 32 Law Lib. 32, 4th series ; 1 Binney, 349, note ; *Waterborough* v. *Newfield,* 8 Greenl. R. 203.

The true basis and foundation of domicil is the intention, the *quo animo* of the residence. The apparent, or avowed intention of constant residence, not the manner of it, constitutes the domicil. *Bradley et al.* v. *Lowry,* 1 Speer's Eq. R. 2.

If it sufficiently appears that the intention of removing was to make a permanent settlement, or for an indefinite time, the

right of domicil is acquired by a residence even of a few days. *The Venus*, 3 Cond. R. S. C. U. S. 115; 8 Cranch, 253.

Where a person removes from one place to another, with the intent to make the latter his permanent abode, his domicil is to be regarded as immediately changed. *Burnham et al.* v. *Rangeley*, 1 Woodb. & Minot's R. 12; *Catlett* v. *Pac. Ins. Company*, 1 Paine, 594.

The actual residence of a person at a particular place, with the intention of remaining there permanently, constitutes the place of his domicil, at least until such intention to remain there has been abandoned. And the declarations of the person, where he has no inducements to falsify the truth, or to deceive those to whom the declarations are made, are the best evidence of his intention to make his actual residence his permanent residence also. *In the matter of Catherine Roberts' Will and Codicil*, 8 Paige, 519.

The mere declaration of a party made in good faith, of his election to make one place rather than another his home, would be sufficient to turn the scale. *Lyman* v. *Fisk*, 17 Pick. R. 234.

If the party has made no express declaration upon the subject, and his secret intention is to be discovered, his acts must be attended to, as affording the most satisfactory evidence of his intention. *The Venus*, 3 Cond. R. S. C. U. S. 115.

Time is the grand ingredient in constituting domicil. In most cases it is unavoidably conclusive. 1 Gallison, 285; Phillimore on Domicil, 141, 144; 32 Law Lib. 94, 96.

Where a party resides for a long time in a country, the presumption of law is, that it is his intention to reside permanently. *Elbers* v. *United Insurance Co.*, 16 Johns. R. 133.

As to oral and written declarations to the evidences of the intention, the indispensable element of true domicil, the civilians have always attached great importance. Phillimore on Domicil, 112, 113; 32 Law Lib. 77.

In England, great weight is given to letters, but the English courts appear generally to ascribe but little value to oral declarations. Phillimore on Domicil, 113; 32 Law Lib. 77. Why such a marked distinction, is not explained.

In the case of *De Bonneval* v. *De Bonneval*, it is said, " the domicil cannot depend upon 'loose grounds' of this sort, (decla-

rations) where there are documents which show that the party looked to France as his home." Phillimore on Domicil, 96; 32 Law Lib. 67.

The acquisition of a new domicil, at the same instant terminates the preceding one. 5 Metcalf, 588, 589; Modern Probate of Wills, 356, 357.

In *Putnam* v. *Johnson*, 10 Mass. R. 492, the court say that, " Probably the meaning of Vattel is, that the habitation fixed in any place, without any present intention of removing therefrom, is the domicil. At least the definition is better suited to America." Story's Confl. of Laws, ch. 3, § 43.

And Judge Goldthwait is of opinion that the peculiar condition of all new countries is such, that the *factum* of domicil, or residence, is essentially different from what it is in an older country, or a city. The *domus*, in the first instance, is either a tree-top, or a mere hovel. 8 Ala. R. 162.

In England, amongst the nobility and gentry of the kingdom, and where the laws of primogeniture, &c., prevail, much stress is laid upon the family mansion, pictures, plate, &c. In the Somerville case the party was a native of Scotland. The family mansion, says the court, was there, and it was kept up according to the father's injunctions. 5 Vesey, 787.

And in *De Bonneval* v. *De Bonneval*, the establishment and ancestral chateau of the deceased in France were very important ingredients in the decision; the family plate was kept there. But, even in that case, where the party had leased a house in London, the judge said, " his taking the lease of a house for eight years would be a strong fact to show intention, if it had been followed up by a continued residence there." Phillimore, 128; 32 Law Lib. 66, 86.

If a person has actually removed to a place with the intention of remaining there an indefinite time, and as a place of fixed present domicil, it becomes his place of domicil, notwithstanding he may entertain a floating intention to return at some future period. *Rue High, appellant*, 2 Doug. Mich. R. 524; Story's Confl. of Laws, § 46.

But all that we had to establish as to domicil in the present case was, that the husband's national domicil was in Mississippi.

60 *

Where a British born subject takes up a permanent residence abroad for commercial purposes, under the protection of treaties, which secure to British subjects certain immunities and privileges, though he may invariably act, and regard himself as an Englishman, the disposition of his personal property will be governed by the law of the country, which he has, under such circumstances, made his home, if continuing such at the time of his decease. 1 Jarm. on Wills, 9, 10; *Moore* v. *Budd*, 4 Hagg. 346; *Stanley* v. *Bemey*, 3 Ib. 373; 5 Eng. Eccles. R. 1671, overruling *Curling* v. *Thornton*, 2 Adams, 612; Eccles. R. 2001; Modern Probate of Wills, 331, 332.

Many aliens reside for years within the commonwealth, without becoming inhabitants of any town or county; for the term inhabitant imports many privileges and duties which aliens cannot enjoy or be subject to; and yet such persons often make wills which are proved and allowed here, and lawfully, because they are residents in some particular county. *Harvard College* v. *Gore*, 5 Pick. R. 373.

Citizens are necessarily inhabitants. Ib. 373.

So a man may lease, as an alien, a national domicil sufficiently for testamentary purposes, and yet not be an inhabitant or citizen, or be entitled to vote. 1 Jarm. on Wills, 2, 3.

National domicil is being invested with a national character in the view of other nations, as for purposes' of succession to personal property, &c.; it depends upon the law of nations; whilst domestic domicil in relation to other places within the same sovereignty depends upon the municipal law of the particular country. 1 Hare & Wallace's Cases, 557.

The inquiry is as to national domicil; the domicil by the law of which the succession to personal estate is to be governed. *Rue High, appellant*, 2 Douglass, Mich. R. 522.

The words "inhabitancy, residence, home," &c., are commented upon in a number of cases in New York arising under "attachment laws," insolvent debtors' acts, &c. 1 Wend. 43; 8 Ib. 140; 20 Johns. 210; 4 Wend. 603; 19 Wend. 13, &c.

But all distinctions of this kind (as dwelling, home, inhabitant, resident, &c.) depend not upon the words of the statutes, but upon the purpose contemplated; and these various words

appear to have received, in the foregoing cases, the same construction that would have been applied to domicil in reference to the subject then in question, had it been used, though, perhaps, not the meaning of domicil used in respect to succession of property and other subjects depending on national domicil.

In some later cases in Massachusetts and New Hampshire, the terms "resident," "inhabitant," "dwelling," "home," &c., used in regard to voting, the settlement of paupers, and taxation, are declared to be synonymous with domicil as understood at common law. 1 Hare & Wallace's Leading Cases, 555; 23 Pick. R. 170, 176; 5 Metc. R. 298, 304; 10 New Hamp. 452; 13 Maine, 225; 15 Ib. 58; 5 Greenl. R. 153.

In the case of *De Bonneval* v. *De Bonneval*, the court said, "I am not inclined to pay much attention to the descriptions of the deceased, in the legal proceedings in France, for it may have been necessary, as the proceedings related to real estate, that he should describe himself as of some place in the kingdom." Phill. 130.

In the Marquis de Gassion's case, this description in a power of attorney, "de présent à Pau, mais demeurant à Paris," settled the question of domicil. Phillimore on Domicil, 130; 32 Law Lib. 87.

The French lawyers appear always to have laid considerable stress upon these descriptions. Phillimore on Domicil, 131; 32 Law Lib. 88.

The weight due to this species of evidence must very much depend upon the particular circumstances of each case, but it would surely be safe to discard altogether the consideration of it. Phillimore on Domicil, 131; 32 Law Lib. 88.

There was never a stronger case of it than the present. Compare the facts of the present case with those in the cases of *Catherine Roberts' Will*, 8 Paige, 519; *Rue High, appellant*, 2 Dougl. Mich. R. 515; *Guier* v. *O'Daniel*, 1 Bin. 354.

II. It is well settled, that in the distribution of the personal estate of deceased persons, the law of the domicil of the decedent is to regulate; and that a widow is entitled to be endowed of the personal estate of her deceased husband, ac-

cording to the law of the place of the domicil of the husband. *Garland, Ex'or,* v. *Rowan,* 2 S. & M. 617.

The *status,* or the capacity of the testator to dispose of his personal property by will, depends upon the law of his domicil. *Catherine Roberts' Will,* 8 Paige, 519.

Personal property has no *situs,* but follows the person, and it is not correct to say that the law of one State by the *lex domicilii* gives place to that of the other, but it is a part of the law of the country where the marriage takes place that it should follow the person and be distributed according to the law of the domicil of the decedent. *Garland, Ex'or,* v. *Rowan,* 2 S. & M. 617, 632 ; Story's Confl. Laws, 312, § 380, 381 ; 403, § 481 ; 314, § 383 ; Ib. § 311, 379 ; 1 Mason's R. 407, 408, and cases cited.

The marriage, in the present case, took place in Virginia ; the husband removed to Mississippi and brought a large number of his own negroes from Virginia to Mississippi ; resided here and died here possessed of the property ; the common law prevailed in both States at the time of the marriage, and ever since, so far as this case is concerned ; it was, accordingly, the law of both States, and, of course, of the place where the marriage took place, that the personal property of the husband had no *situs ;* that it followed his person, and more especially when he actually took it with him, and that it was to be distributed according to the law of his domicil at the time of his death. The property is here.

On the doctrines of " tacit contract" and future " acquests and gains," I refer them to the following authorities, namely, 2 Kent's Com. 94, 3d ed. notes ; 2 Kinn. Comp. 153, § 4 ; 154, § 5 ; 155, 156 ; Story's Confl. Laws, 150, § 171 ; 151, § 174 ; 159, § 176 ; 161, § 190 ; 308, § 376 ; 311, § 379 ; 312, § 380.

Mr. Justice SMITH delivered the opinion of the court.

This is an appeal from the probate court of Lowndes county.

It appears from the record in this case that in June, 1852, the appellee, widow of Robert Hairston, deceased, renounced before the said court all claim to the estate of her deceased husband, under his will, and declared her intention to demand dower in his estate, both real and personal, and applied, by petition, at

the August term following of said court for an allotment of dower in his real estate, and for her distributive share of his personal estate.

She alleges in her petition, that she is the widow of Robert Hairston, deceased, who died in March, 1852, at the place of his domicil in Lowndes county, leaving a will in which no provision was made for her; that George Hairston, one of the appellants, was the administrator with the will annexed, and that her said husband died possessed of a large estate, consisting of lands, slaves, stock, and other personal property. That he died unembarrassed; and that his personal property was not chargeable with any debts; and that he died, leaving no issue surviving, or lineal descendants, or heirs. The petitioner alleges, therefore, that she is entitled, as her dower and legal share of his estate, to a life-estate in one half of his land, and to one half of the personal estate in fee-simple. She prays for a writ of dower accordingly, and to have her share of the personal estate allotted to her.

At the succeeding term of the court, some of the heirs and distributees of the deceased filed their petition, in which they allege that the will of the deceased had been probated, by which he revoked all former wills, and devised his whole estate, real and personal, to one of his slaves, a child six years old, then in the State of Mississippi. They allege that the will was effective as a revocation of all former wills, but insist that the clause containing said devise was void, and that the real estate will descend, and the personal property will be subject to distribution as if he had died intestate.

They further allege, that the deceased left no child or lineal descendants, but left surviving his widow, the said Ruth S. Hairston, the petitioners, and others who were his heirs at law. They admit the right of the widow to dower in the land as claimed by her. They allege that the deceased and Mrs. Hairston were married in the State of Virginia, where they had their domicil, and where they continued to reside for many years; that in 1836, the deceased removed a large number of his slaves, and placed them upon lands which he had purchased in the State of Mississippi, and afterwards removed other slaves to the same

State; that he frequently visited Mississippi to attend to his interest there, but did not remove his family, and kept up his establishment in the State of Virginia. In 1841, unpleasant relations sprung up between himself and Mrs. Hairston, and being a whimsical and capricious man, in a sudden fit of passion he left Virginia, where he owned several plantations, but without any intention of changing his domicil. After having left the State of Virginia he visited Europe, whence he returned to this State in 1842, where he remained attending to his business down to the time of his death, which occurred in 1852. They aver that at the time of his death his domicil was in the State of Virginia, and insist that his wife, who never removed from that State, is not entitled to a share of his personal estate by the laws of Mississippi; but under that of Virginia, according to which she would be entitled to only an estate for life in one half the slaves of which he died possessed.

They further insist, that if it should be held that the domicil of the deceased was, at the time of his death, in this State, that she is entitled to her share of the slaves, which the deceased owned or possessed, before his change of domicil, according to the law of Virginia, and not under the statute of Mississippi, which would vest in her the absolute title in fee-simple to one half of them.

It is not controverted, if Robert Hairston died having his permanent residence in Mississippi, that the rights of his widow, as to all the personal property acquired after his change of domicil, are to be determined by the law of this State, and not by that of Virginia. Our first inquiry, therefore, respects the place of his domicil, at the time of his death,—whether it was in Virginia, or Mississippi?

In its ordinary acceptation, by the term "domicil" is meant the place where a person lives or has his home. In this sense, where a person has his actual residence, inhabitancy, or commorancy, is called his domicil. But in a strict and legal sense, says Judge Story, "that is properly the domicil of a person where he has his true, fixed, permanent home and principal establishments, and to which whenever he is absent, he has the intention of returning." Confl. Laws, p. 39, § 41. This is per-

haps the most comprehensive and correct definition of the term which could be given.   Two things must concur, according to the same authority, to constitute domicil : " first, residence ; and secondly, the intention of making it the home of the party.   There must be the fact and the intent."   Where it is certain that these conditions must concur to constitute a domicil, it is a matter frequently of difficulty to determine, from the facts in cases of contested domicil, the existence of such residence and the intention to make it the permanent home of the party.   From the nature of the subject, it is impracticable to lay down any very definite rule by which either the fact of a permanent residence, or the intention of permanent residence, is to be ascertained.   In none of the decided cases on this subject is there a definite period of time recognized, as being necessary to create a domicil.   The time may be shorter or longer, according to the circumstances ; and in all cases, the question whether a person has or has not acquired a domicil, must depend mainly upon his actual, or presumed intention.   In the case of *Moore* v. *Darras*, 4 Hag. Eccl. R. 346, it was said domicil does not depend upon residence alone, but upon a consideration of all the circumstances of the case ; a person being at a place is *primâ facie* evidence that he is domiciled there ; but it may be explained, and the presumption rebutted.   The place where a man carries on his business or professional occupation, and has a home or permanent residence, is his domicil ; and he has all the privileges, and is bound by all the duties flowing therefrom.   As a domicil may be acquired by a longer or shorter residence, depending upon the circumstances of the case, its true basis and foundation must be the intention, the *quo animo* of evidence.   The apparent or avowed intention of residence, not the manner of it, constitutes domicil.   *Bradley* v. *Lowry*, 1 Spear, Eq. R. 2.   In the absence of any avowed intention, and of acts which indicate a contrary intention, a long continued residence is regarded as a controlling circumstance in determining the question of domicil.   In most cases it is unavoidably conclusive.   *The Ship Ann Green*, Gall. R. 274 ; *The Harmony*, 2 Rob. R. 322.   In the matter of *Catherine Roberts'* *Will*, it was said, " the declarations of the party himself, where

he can have no object or inducement to falsify the truth or to deceive those to whom such declarations are made, are the best evidence of his intention to make his actual residence his permanent residence also." 8 Paige, R. 424. But where acts, although unaccompanied by declarations, concur with long continued residence or habitancy, evincing an intention of permanent residence, it is manifest that they furnish as satisfactory evidence of that intention as the express declarations of the party to that effect. So it is laid down by Judge Story, that even where a party has two residences at different seasons of the year, "that will be esteemed his domicil which he himself selects, or describes, or deems to be his home, or which appears to be the centre of his affairs, or where he votes or exercises the rights and duties of a citizen." Confl. of Laws, p. 45, § 47; *Shelton* v. *Tiffin*, 6 How. S. C. R. 163.

Let us apply these principles, which are sustained by undoubted authority, to the facts in the cause about which there is no controversy.

It appears from the evidence, that Robert Hairston and the appellee were natives of the State of Virginia, where they were domiciled at the date of their intermarriage, and where they continued to reside until 1841. Hairston was then the owner of a large property, situated there, consisting of lands and slaves, with which he never parted. In 1841, having conceived an unconquerable aversion for the appellee, he abandoned his home, visiting New York and Europe, whence he returned to Mississippi in 1842. He had, in 1836, purchased land in Lowndes county, in this State; and had, before he left Virginia, removed thither a sufficient number of his slaves to cultivate a large plantation. The appellee did not accompany him to Mississippi, but remained in Virginia and resided at the family mansion. After his return from Europe in 1842, he resided upon some one of his plantations in this State, with occasional and temporary absences on business, until he died in 1852. After his return to this State, he purchased a large quantity of land, and added largely to his slave property. He never revisited Virginia after he came to this State in 1842, but continued his plantations there, and kept up the family

Hairston, Jr., et al. *v.* Hairston.

mansion in a style suitable to his means. He sold many tracts of the lands which he had purchased in this State, and in the deed of conveyance for the lands sold by him, he described himself as of Lowndes county in this State. He had in operation in this State five plantations at the time of his death. About the year 1845, he purchased a healthy situation, which he called "Choctaw Spring," and built there an indifferent house, in which he resided. He said that place was his home, and that he expected to live and die there. He repeatedly voted for county and State officers in Lowndes county, where he lived; and he attended and voted at the two last elections preceding his death, held in that county.

These facts, we think, conclusively show that when Hairston left Virginia in 1841, he intended to abandon his domicil in that State. But as a domicil, when once gained, continues until one is acquired in some other place, it is admitted that by his abandonment of his home in Virginia, he did not destroy his domicil there. His departure from Virginia, under the circumstances, can have no other effect than to lessen the degree of evidence required to establish the fact of his domicil in Mississippi. But if it were admitted that Hairston, when he came to Mississippi in 1842, did not intend to make it his permanent place of residence, but designed to retain his domicil in Virginia, we cannot doubt that he changed such intention, and became in fact and intention domiciled in this State. His declaration that he expected to live and die at his residence in Lowndes county, his continued residence for ten years at a place where a large part of his property was situated, and finally, the exercise of the rights of a citizen, are without doubt conclusive on the subject.

It was said in argument, that when Hairston sought a residence in Mississippi, he abandoned his duty as a husband, and thereby violated a sacred obligation imposed by the laws of society; and hence, upon a principle of public policy, he should be denied the rights of domicil in this State. However reprehensible the motive of the alleged act may have been, in a moral point of view, it is evident that it was not his intention, by his change of residence, to affect injuriously the pecuniary

rights of the appellee, as her interest in his estate has thereby been materially enhanced. Hence if the foundation of the argument were better sustained than it is, by the proofs in the cause, the objection comes from the wrong quarter.

The next question is, whether the appellee is entitled to her widow's portion out of the slaves which were owned by the deceased in the matrimonial domicil before he removed to and permanently settled in Mississippi, under the law of that domicil, or under that of Mississippi.

As we have stated, if the distribution is to be made according to the statute of this State, the appellee will succeed to one half of the slave property, and will hold it by an absolute title in fee-simple; whereas if the law of Virginia is to give the rule of succession, she will have only a life-estate in one half of the slaves. This question will admit of very little debate.

We have decided that Hairston's domicil, at the time of his death, was in Mississippi. Hence, although the appellee did not follow him there, but remained in Virginia, her legal domicil was that of her husband at the time of his death. Story, Confl. Law, p. 43, § 46. The case, therefore, presented by the petition of the appellee, is not one in which the citizen of a foreign jurisdiction solicits the aid of our courts to enforce rights arising under a contract made elsewhere; but it is one in which the widow of a citizen, having his proper domicil within this State, invokes an application of our municipal regulations for the ascertainment of her rights in regard to his estate. But the rights claimed against her are alleged to arise out of a marriage celebrated in another State. Therefore, upon a well settled principle of comity, it becomes our duty to enforce those rights, if they shall be found to exist. This brings us to the question of what were the respective rights, in reference to the property in controversy, of the appellee and her husband, arising out of the contract of marriage, as regulated by the laws of Virginia.

In the ingenious and very learned argument of counsel, it was assumed that the widow, under the law of Virginia, does not take her share of the deceased husband's estate by virtue of the general statute of distributions; but is entitled to it under a separate and independent provision of the law.

This may be conceded. It may also be admitted, that the wife, not being of the next of kin to the husband, does not succeed to her share of his estate as a distributee, in the proper sense of the term; but that the right to her portion of the deceased husband's estate is an incident ingrafted by law upon the contract of marriage. But the concession will avail nothing, unless it can be shown that the right of the *feme covert* in the personal estate of the husband, during the subsistence of the marriage, are of a superior character and different nature to those of the next of kin; or, in other words, unless it can be proved that by the consummation of the marriage, the wife acquires a vested interest in the personal estate of the husband, possessed at the time of the marriage, or acquired subsequently and before there has been a change of domicil. It is evident to us, that this position is not maintainable.

By the law of Virginia regulating the rights of husband and wife, the husband becomes the absolute owner of the personal property of the wife which is in her possession at the time of the marriage, or which he shall reduce into his possession during its continuance. The marriage is held to operate an absolute gift to the husband of all the personal property of the wife. During the subsistence of the marriage, the wife has no right whatever to the personal estate of the husband, or to any portion of its proceeds or profits. This is conclusively shown by the unlimited right of the husband to dispose of it for any purpose whatever. Such an unrestricted right of disposition is manifestly inconsistent with the idea of a fixed and vested right on the part of the wife to his personal property. It is true that the husband is incapable, by a testamentary disposition, which can only take effect after his death, to deprive the wife of her statutory portion of his effects of which he may die possessed. In this respect only does the wife stand on a different or better foundation than those persons who, as next of kin, would be entitled to the succession, as heirs or distributees, in the event the husband should die intestate.

It matters not, therefore, whether the right of the wife to her share of the deceased husband's personal effects, arises under the general statute of distributions of the State of Virginia, or

Hairston, Jr., et al. *v.* Hairston.

whether it is based upon a distinct and independent act of legislation. The question is, does the wife, by the contract of marriage, under the operation of the law of Virginia regulating the institution of marriage, acquire a vested interest in the personal estate of the husband, then possessed by him or subsequently acquired? It seems too evident to admit of debate, that she acquires no immediate fixed right of present or future enjoyment, which are the conditions of a vested estate. 4 Kent, 202. The most that can be said of it is, not that it is a vested interest in or right to the personal estate of the husband, but a privilege to have her portion of the personal effects of which the husband may die possessed, and of which he cannot deprive her by a testamentary disposition, which can only take effect after he is dead.

Where, by the operation of the law regulating the institution of marriage, the husband is the absolute and exclusive owner of the personal property brought into the marriage, it is clear that the doctrine of a tacit contract cannot apply. If the wife has no vested interest of any character to the personal property possessed at the time of the marriage, or to any future acquest and gains which may accrue during its continuance, there is, evidently, nothing to which it can attach or upon which it could operate. Personal property has no *situs*. In contemplation of law it follows the owner, and is subject to the law which governs his person, both with respect to the disposition of it, and its transmission either by succession or the act of the party. It is the law of Virginia, as well as the law of Mississippi, that personal property shall be distributed according to the law of the domicil. Hence, if any tacit contract can be imagined to attach to the fact of marriage as regulated by the law of Virginia, it is that the wife shall be entitled to distribution according to the law of the place in which the husband may have his domicil at the time when he shall die.

Let the decree be affirmed.