# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-EC-00377-SCT

*AMANDA GUNASEKARA*

*v.*

*MATTHEW BARTON AND MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2023 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| TRIAL COURT ATTORNEYS: | B. SEAN AKINS |
| | MICHAEL B. WALLACE |
| | CHARLES EDWARD COWAN |
| | SPENCER MARK RITCHIE |
| | SIMON TURNER BAILEY |
| | SPENCE JAYON FLATGARD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SPENCER MARK RITCHIE |
| ATTORNEYS FOR APPELLEES: | B. SEAN AKINS |
| | MICHAEL B. WALLACE |
| | CHARLES EDWARD COWAN |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | AFFIRMED - 05/11/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Amanda Gunasekara seeks to run in the Republican primary election for Public Service Commissioner, District 3 (Northern District). Matthew Barton, a candidate for district attorney in Desoto County, challenged her qualifications to run for commissioner and, specifically, whether she had been a citizen of Mississippi for five years prior to the election

date. The trial court found that Gunasekara had not met the citizenship requirement and disqualified her as a candidate. We find that the trial court did not manifestly err by holding that Gunasekara failed to meet the residency requirements for the office of Public Service Commission. Therefore, we affirm the decision of the Hinds County Circuit Court.

## FACTS AND PROCEDURAL HISTORY

¶2. Following Gunasekara's father's retirement from the military, Gunasekara's family permanently moved to Decatur, Mississippi, in 1998. Gunasekara lived in Mississippi from 1998 until 2010, when she graduated from the University of Mississippi School of Law. She has held a bank account with Citizens Bank of Philadelphia since 2007. In 2010, Gunasekara and her husband, Surya Gunasekara, moved to Washington, D.C.

¶3. From 2010 to 2018, Gunasekara lived in D.C. and worked in the United States House of Representatives, the United States Senate, and the Environmental Protection Agency (EPA). Gunasekara testified that she had not intended to stay in D.C. indefinitely and did not consider D.C. her home during that time frame. While she was there, however, she stated that she had no definite plans to leave. Gunasekara had D.C. car tags and a D.C. driver's license. Gunasekara also voted in D.C.

¶4. Gunasekara and her husband bought a house in D.C. in 2014. Gunasekara received a homestead deduction for her D.C. house from 2014 until 2021. To qualify for a homestead deduction, "[t]he property must be occupied by the owner/applicant . . . [and] [t]he property must be the principal residence (domicile) of the owner/applicant." *See* DC.gov, Office of

2

Tax and Revenue, https://otr.cfo.dc.gov/page/homesteadsenior-citizen-deduction (last visited May 2, 2023). Gunasekara testified that she had received the homestead deduction by inadvertent mistake and that the deduction had automatically renewed. She testified that, in 2023, she contacted the D.C. Office of the Chief Financial Officer, Office of Tax and Revenue, to rectify the situation. To support this, the record contains an email dated February 10, 2023, that states,

> The Office of Tax and Revenue's (OTR) Homestead Unit has received your message regarding repaying an unpaid balance on your former District residence located at 418 South Capitol St., SE. Due to the property's new ownership, as a prior deeded owner you are not liable once a sale has been recorded. Any outstanding balances that were on the property would have been settled by the new deeded owners' title company at closing.

¶5.     In March 2017, Gunasekara became Senior Advisor for Air to the Administrator of the EPA, a full-time position. At that point, the Gunasekaras had two children. The children attended daycare and/or school in D.C.

¶6.     During the summer of 2018, Gunasekara stated that she, along with her husband, decided to transition back to Mississippi to make it their permanent home. Gunasekara's parents, Mike and Ada McGrevey, lived at 147 Chapel Hill Road, Decatur, Mississippi. Property adjacent to the McGreveys, that included an older house, was announced for sale in August 2018. On August 21, 2018, Gunasekara's "parents and [she] agreed to purchase a home for [her] family adjacent to their farm, located at 16489 Hwy. 503 Decatur, Mississippi." Gunasekara's parents stated that they had discussed the property with Gunasekara and had agreed to put a bid on the property: Gunasekara's parents would take

3

the majority of the land, and Gunasekara would take the house. Gunasekara's parents put the money down for the house, and the deed was issued to the McGreveys for the entirety of the property.[1] Gunasekara testified that she did not have any thoughts of staying in D.C. when the bid for the Decatur property was accepted.

¶7. Gunasekara stated that in September 2018, they contacted a local contractor to evaluate the property, to make plans for renovation, and to calculate costs.

¶8. On October 1, 2018, the homestead deduction for their D.C. home was renewed. Gunasekara testified that, also in October, her mom and another person began clearing the land and pulling down dilapidated buildings on the Decatur property. On October 23, Gunasekara renewed a car tag in D.C. Gunasekara testified that she did this for parking purposes.

¶9. The Decatur house needed significant renovations. In November 2018, the McGreveys did a walk-through of the house with Gunasekara and the contractor. Gunasekara also spoke with local educators about enrollment in school for their son and researched daycare options. Gunasekara testified that when she came to Mississippi from D.C. to meet with contractors and educators, she stayed with her parents in her childhood bedroom. The McGreveys stated that they "continued to oversee day-to-day work of the home while [Gunasekara] commuted back and forth from Decatur to DC."

---

[1] Gunasekara testified that her parents bought the house for her "to eventually procure once [she] had the funds lined up to pay for it on paper."

¶10.    Gunasekara was registered to vote in D.C. from 2010 through 2018. On November 6, 2018, Gunasekara voted in D.C. for a candidate in an Advisory Neighborhood Committee (ANC) election.[2] She stated that she had voted to help a friend who was running as a Republican in a majority-Democrat neighborhood.

¶11.    Interior renovations to the Decatur house began in January 2019. On January 28, 2019, Gunasekara obtained a Mississippi driver's license, which automatically registered her to vote in Mississippi.

¶12.    On February 7, 2019, Gunasekara resigned from her full-time position at the EPA in D.C. On February 8, she established and incorporated her nonprofit, Energy 45 Fund, in Jackson.

¶13.    From March to June 2019, the Gunasekaras made several payments to the contractor

---

[2]According to the DC.gov website,

An ANC . . . is a non-partisan, neighborhood body each made up of locally elected representatives called Advisory Neighborhood Commissioners. They are a unique feature of the District's Home Rule Charter.

. . . .

The ANCs' main job is to be their neighborhood's official voice in advising the District government (and Federal agencies) on matters that affect their neighborhoods. Although they are not required to follow the ANCs' advice, many District agencies are required to give the ANCs' recommendations 'great weight.'

See DC.gov, Advisory Neighborhood Commissions, https://anc.dc.gov/page/about- ancs (last visited March 17, 2023).

5

as renovations continued in the Decatur house. Gunasekara testified that she continued to commute from D.C. to Mississippi during this time.

¶14. In June 2019, the renovations were completed, and Gunasekara moved her family and belongings to Decatur. In August, Gunasekara's daughter began daycare in Newton County, and her son was enrolled in Newton County Elementary School.

¶15. From June 2019 until March 2020, the Gunasekaras rented their D.C. house on Airbnb for short-term rentals. The Gunasekaras also had a longer term tenant that lived in one bedroom of the house. At some point in 2019, Gunasekara's parents deeded the Decatur house to her husband and her.

¶16. In March 2020, Gunasekara was appointed Chief of Staff to the EPA. She stated that she committed to her boss that she would be in the position for one year. Gunasekara's husband also accepted an appointee job in D.C. The EPA position required Gunasekara to be in D.C. for most of the work week, during which she and her husband stayed at their D.C. property. Throughout her time as EPA Chief of Staff, her children attended school in Mississippi, and she continued to pay taxes in Mississippi. Gunasekara testified that she still considered Mississippi her primary residence during that time, and she traveled home weekly.

¶17. In June 2020, the Gunasekaras filed a loan application to refinance their house in D.C. A provision in the refinance documents stated that

> Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and

> shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Gunasekara testified that she had been aware of that provision. She testified that she had spoken with her mortgage specialist and that it was customary practice in D.C. for "political employees and service members that are there on a temporary basis to have a mortgage or refinance agreement that looks like what we signed on to." Gunasekara and her husband signed the loan documents in July 2020.

¶18. Gunasekara's position ended when the new administration began on January 20, 2021. Gunasekara and her husband returned to Mississippi at that time. In March 2021, the Gunasekaras agreed to purchase 1300 Pleasant Drive, Oxford, Mississippi. While a house on that property was being constructed, they lived at a rental property located at 100 Camellia Lane, Oxford. In June 2021, the Gunasekaras enrolled their children in the Oxford School District. The Gunasekaras purchased the Oxford property on October 29, 2021, and sold their house in D.C. on November 17, 2021.

¶19. In November 2022, Gunasekara announced her intention to run for Public Service Commissioner, District 3 (Northern District), for the August 8, 2023, Republican Party primary election.[3] On January 5, 2023, Gunasekara filed documents to qualify for the position.

---

[3]Because no Democratic candidate qualified to run for the seat, the winner of the Republican primary election will become the next commissioner.

¶20.    On February 9, 2023, Matthew Barton filed a contest of Gunasekara's qualifications with the Executive Committee of the Mississippi Republican Party (the Executive Committee). Barton contended that, because Gunasekara had been a resident of D.C. within the preceding five year period, she was not qualified to run for commissioner.

¶21.    On February 16, 2023, after a hearing on the merits, the Executive Committee denied Barton's contest and certified Gunasekara as a candidate.[4]

¶22.    On February 24, 2023, Barton filed a petition for judicial review of the Executive Committee's decision in the Hinds County Circuit Court. This Court appointed Special Circuit Judge Lamar Pickard to preside over the case. After a hearing on the merits, the trial court entered an order that disqualified Gunasekara as a candidate. In its order, the trial court reasoned that Gunasekara was required to have been a resident of Mississippi on November 7, 2018, the date that is at least five years prior to the November 2023 general election. It found that

> The evidence is clear that in 2018, [Gunasekara] and her family determined that they would relocate[] to Mississippi and that in August, 2018 [Gunasekara] and her parents acquired a house in Decatur, Mississippi with the intention of returning to Mississippi. Further, that by the spring of 2019, [Gunasekara] had resigned her job in [D.C.], registered to vote in Mississippi and had become a Mississippi resident.

The trial court also found, however, that the evidence "clearly" showed that Gunasekara had

---

[4]There is no written transcript of the hearing before the Executive Committee; however, the hearing was recorded by video, and a copy of the video was submitted to the trial court by the Mississippi Republican Party. The video is not contained in the record before this Court.

continued to maintain her residency in D.C. in 2018, including exercising her right to vote there on November 6, 2018. The trial court found that there was a "plethora of evidence," including her voting in D.C. on that date, that clearly established that she was a resident of D.C. on the day before she was required to have been a Mississippi resident and that no evidence showed a change in that status in the twenty-four-hour period afterward.

¶23. Therefore, the trial court concluded that, "[e]ven if this Court found all of that evidence successfully rebutted, which the Court expressly does not do, when all of the evidence is considered as a whole, it is clear and the Court so finds, that [Gunasekara] was a citizen of the District of Columbia on November 7, 2018."

¶24. Gunasekara appealed the circuit court's decision to this Court and raised the following issues:

I. Whether the trial court applied an erroneous legal standard for citizenship by determining whether Gunasekara met the five-year durational-citizenship requirement to run for Mississippi Public Service Commissioner.

II. Whether the trial court's determination that Gunasekara did not meet the citizenship requirement conflicts with this Court's decision in *Hale v. State Democratic Executive Committee*.

III. Whether the trial court's application of the citizenship requirement violates the Fourteenth Amendment of the United States Constitution.

**ANALYSIS**

¶25. "[I]n a candidate qualification challenge, the standard of review for questions of law is *de novo*." *Simmons v. Town of Goodman*, 346 So. 3d 847, 850 (Miss. 2022) (quoting

9

*Hale v. State Democratic Exec. Comm.*, 168 So. 3d 946, 951 (Miss. 2015)). This Court reviews a trial judge's findings of fact for manifest error, "including whether the findings were the product of prejudice, bias, or fraud, or manifestly against the weight of the credible evidence." *Id.* (internal quotation mark omitted) (quoting *Hale*, 168 So. 3d at 951). "[W]hether a candidate meets [the] residency requirement [to run for office] clearly involves questions of fact." *Id.* (second and third alterations in original) (internal quotation marks omitted) (quoting *Hale*, 168 So. 3d at 951).

¶26. Pursuant to Mississippi Code Section 77-1-1, a public service commissioner must "possess the qualifications prescribed for the Secretary of State." Miss. Code Ann. § 77-1-1 (Supp. 2022). Thus, in order to qualify as a candidate for commissioner, Gunasekara is required to be "a citizen of the state five years next preceding the day of [her] election . . . ." Miss. Const. art. 5, § 133. Therefore, the relevant date for Gunasekara's citizenship in Mississippi is November 7, 2018. Our Constitution provides that "[a]ll persons, resident in this State, citizens of the United States, are hereby declared citizens of the State of Mississippi." Miss. Const. art. 3, § 8. Thus, "[i]n Mississippi, for the purpose of elections, residency and domicile are synonymous." *Hale*, 168 So. 3d at 951 (quoting *Hubbard v. McKey*, 193 So. 2d 129, 132 (Miss. 1966)); *see also Meredith v. Clarksdale Democratic Exec. Comm.*, 340 So. 3d 315 (Miss. 2022) ("Residency under Mississippi election law is based on a person's domicile." (citing *Hale*, 168 So. 3d at 951)). "The definition of domicile in this State is well established: 'there must have been (1) an actual residence voluntarily

established in [Mississippi], (2) with the *bona fide* intention of remaining there, if not permanently, at least indefinitely.'" **Hale**, 168 So. 3d at 951 (quoting **Smith v. Smith**, 194 Miss. 431, 434, 12 So. 2d 428, 429 (1943)).

I.      **Whether the trial court applied an erroneous legal standard for citizenship by determining whether Gunasekara met the five-year durational-citizenship requirement to run for Mississippi Public Service Commissioner.**

¶27.    Gunasekara begins by contending that the trial court applied an erroneous legal standard for citizenship. She states that the trial court looked to mere residence in its analysis and not domicile; therefore, she argues that the appropriate standard for the entire appeal is de novo. We disagree.

A.      **Intent**

¶28.    "The first principle of the law of domicile is that every person has a domicile at all times and, at least for the same purpose, no person has more than one domicile at a time." **Newman v. Newman**, 558 So. 2d 821, 825 (Miss. 1990) (citing **Weisinger v. McGehee**, 160 Miss. 424, 432, 134 So. 148, 150 (1931)). As this Court has held,

> "even where a party has two residences at different seasons of the year, that will be esteemed his domicil[e] which he himself selects, or describes, or deems to be his home, or which appears to be the centre of his affairs, or where he votes or exercises the rights and duties of a citizen."

**Hale**, 168 So. 3d at 952 (alteration in original) (quoting **Hairston v. Hairston**, 27 Miss. 704, 719 (1854)). "[The] domicile of origin continues until another is acquired." **Stubbs v. Stubbs**, 211 So. 2d 821, 824 (Miss. 1968) (citing **Lucia v. Lucia**, 200 Miss 520, 525, 27 So. 2d 774 (1946)).

11

¶29. It is clear that Gunasekara established a domicile in D.C. at some point before the relevant date. Therefore, we must determine whether she acquired a new domicile in Mississippi on or before November 7, 2018. Gunasekara focuses on intent as the overriding factor in establishing domicile and argues that the trial court failed to give adequate weight to her declaration of intent. She testified that, in early 2018, she and her husband decided to leave D.C. and relocate to Mississippi permanently. She contends that her testimony coupled with her parents' purchase of the property was clear evidence that she intended for her Mississippi residence to be her permanent home.

¶30. Barton argues that intent to establish domicile must be a *present* intent. He contends that Gunasekara must have had a *bona fide* intent in 2018 to be domiciled in Mississippi *at that time*. Barton emphasizes that Gunasekara did not claim that any of her acts in 2018 were designed to make her a citizen of Mississippi at the time and points to Gunasekara's statement that her "actions in 2018 were just natural—a natural series of events where I was leaving D.C. and once again making Mississippi my permanent home and a series of actions taken consistent with that." When asked if her parents' purchase of the property had anything to do with legal ramifications as to residency, Gunasekara responded, "I was just living my life and . . . bringing my kids back to Mississippi." Therefore, Barton asserts that the evidence very clearly shows that Gunasekara's intent in 2018 was to make Mississippi her home in the future and that her express intent in 2018 was that D.C. would continue to be her domicile until some unknown time in 2019 when the renovation of the Decatur house would

12

be completed.

¶31.     Gunasekara cites ***Stubbs***, in which this Court held that "[t]he foundation of domicile is intent. This intention may be established by physical presence, declaration of intent, and all relevant facts and circumstances, and in this connection it has been held that the declarations of the party himself are most important." ***Stubbs***, 211 So. 2d at 825. In ***Stubbs***, however, the Court was tasked to determine the domicile of a person already deceased. ***Id.*** at 823. Therefore, to determine the decedent's intent, this Court considered the decedent's statements and actions  at the time he was transitioning from Louisiana to Mississippi. ***Id.*** at 823-25. This Court wrote, "[t]he cogent question to be determined, therefore, is: Did the decedent by his acts or words *subsequent to departing Baton Rouge* signify an intent on his part to reestablish his domicile in Mississippi?" ***Id.*** at 825. The Court concluded:

> We think that under the relevant facts and circumstances in this case, removal of personal belongings to, actually residing in, Natchez, and the sworn declaration of the decedent on November 24, 1964, avowing his residence to be 309 N. Pearl St., Natchez, Mississippi,[5] is the best and only real evidence of his intent as to domicile and was sufficient to reestablish the same in Natchez, Mississippi. In our opinion the solemnity of the oath rises above the general desultory statements to his mother and friends that he did not care for Natchez, Mississippi, as a place of residence.

***Id.***

¶32.     Gunasekara also cites ***Hairston***, in which, again, this Court determined the domicile of a deceased person. ***Hairston***, 27 Miss. at 716. The decendent was domiciled in Virginia

---

[5]The decedent had applied for a passport and had listed his Mississippi address as his permanent residence. ***Id.*** at 824.

but bought land in Mississippi in 1836. *Id.* at 717. Although the deceased had frequented

Mississippi, he had not brought his family there and had "kept up his establishment in the

State of Virginia." *Id.* at 718. In 1841, after "unpleasant relations sprung up between himself

and [his wife]," the decedent had left Virginia and visited Europe and then had returned to

Mississippi the following year. *Id.* From 1842 to 1852, the decedent remained in Mississippi.

*Id.* The ***Hairston*** Court explained:

> "that is properly the domicil of a person where he has his true, fixed, permanent home and principal establishments, and to which whenever he is absent, he has the intention of returning." This is perhaps the most comprehensive and correct definition of the term which could be given. *Two things must concur*, the same authority, to constitute domicil: "first, residence; and secondly, the intention of making it the home of the party. *There must be the fact and the intent*."

*Id.* at 718–19 (emphasis added) (citations omitted).

¶33.    The Court continued, stating,

> "the declarations of the party himself, where he can have no object or inducement to falsify the truth or to deceive those to whom such declarations are made, are the best evidence of his intention to make his actual residence his permanent residence also." . . . But where acts, although unaccompanied by declarations, concur with long continued residence or habitancy, evincing an intention of permanent residence, it is manifest that they furnish as satisfactory evidence of that intention as the express declarations of the party to that effect.

*Id.* at 719-20 (citation omitted). This Court wrote that, when determining domicile, "[t]he

place where a man carries on his business or professional occupation, and has a home or

permanent residence, is his domicil." *Id.* at 719. It found probative the decedent's

"declaration that he expected to live and die at his residence in Lowndes county, his

14

continued residence for ten years at a place where a large part of his property was situated, and finally, the exercise of the rights of a citizen." ***Id.*** at 721. Thus, to determine the decedent's intent, the ***Hairston*** Court also looked to the decedent's past actions and statements at the time he had left Virginia and through to his death to determine his intent. ***Id.*** at 720-21.

¶34. In contrast, the ***Hale*** Court, quoting ***Stubbs***, found important and critical to its analysis the potential candidate's declarations regarding his intent to change his domicile. ***Hale***, 168 So. 3d at 952-53. There, the Court stated that, "[a]s a domicil[e] may be acquired by a longer or shorter residence, depending upon the circumstances of the case, its true basis and foundation must be the intention, the *quo animo* of evidence." ***Id.*** at 952 (internal quotation mark omitted) (quoting ***Hairston***, 27 Miss. at 719).

¶35. Although the declarations of the candidate are "most important[,]" the declarations "must be accompanied by evidence of . . . actual living arrangements and activities in [the state.]" ***Meredith***, 340 So. 3d at 325 (citations omitted). The residency requirement "is not satisfied with a simple declaration that one intends to be a resident of a particular county when the overwhelming proof shows that he actually resides elsewhere. It is not enough that [a candidate] considers himself an official resident of [the state]. He must actually reside there permanently." ***Young v. Stevens***, 968 So. 2d 1260, 1264 (Miss. 2007).

¶36. Gunasekara argues that, "[t]o the extent the trial court even accounted for [her] testimony concerning her intent, it certainly did not give it adequate weight as required under

15

this Court's precedent for a proper domicile analysis." If this Court accepted Gunasekara's argument, however, a candidate's present declaration regarding her past intentions would determine domicile. Instead, this Court's precedent shows that, although a present declaration is probative in the analysis, in order to determine domicile, all evidence must be considered, including actions and declarations at the time of the transition between residences.

¶37. Here, in its final judgment, the trial court acknowledged that the residency requirement for citizenship is based on domicile and found that Gunasekara had established her "residency and citizenship in [D.C.] at some point prior to November 7, 2018."[6] The trial court also acknowledged that, in 2018, Gunasekara had determined that she would relocate to Mississippi. It then looked to Gunasekara's exercise of her right to vote in D.C. the day before the election, along with the "plethora of evidence supporting [Gunasekara's] citizenship in [D.C.] on November 7, 2018" to determine that she had not abandoned her domicile before that date. The trial court properly considered all factors in its analysis. Therefore, the trial court did not use an incorrect legal standard to determine Gunasekara's

---

[6]In its final judgment, the trial court stated that "in order for the candidate to meet the five year citizenship requirement, the candidate must have been a resident of Mississippi on November 7, 2018 . . . ." Gunasekara takes issue with the trial court's use of the term "resident" or "residency" in its opinion. Gunasekara contends that the proper analysis was whether she was domiciled in D.C. Yet, in its analysis, the trial court cited the standard for domicile and stated that residence was based on domicile. It is clear that the trial court used domicile as the appropriate standard and chose the synonymous terms "resident" or "residency" to discuss in its opinion.

citizenship.[7]

### B.    Evidence of Domicile

¶38.    Gunasekara next asserts that the trial court either overlooked or did not give adequate weight to the evidence between August 2018, when she agreed to purchase the Decatur house, and January 2019, when she registered to vote in Mississippi. Gunasekara points to her testimony that the Decatur house needed significant work, that she began to work with a contractor in September 2018 to complete the work, that the work began in October 2018 and continued until June 2019, and that she began commuting between Mississippi and D.C. in October 2018. She argues that these act clearly establish her intent to abandon D.C. and remain in Mississippi indefinitely.

¶39.    Barton argues that the test for domicile requires that a candidate must have had an actual, physical residence in Mississippi. He contends that in order for a change of domicile to be effective, the candidate must acquire a new residence and then actually move. His contention is that Gunasekara did not have a *bona fide* residence in Mississippi until June

---

[7]Gunasekara cites *Hale* and contends that she was not required to sell her D.C. property or to cease using the property in order to establish her domicile in Mississippi. In *Hale*, Bill Stone, a potential candidate for the Mississippi Senate, lived in Ashland, Mississippi, for more than twenty years, where he owned a home. *Hale*, 168 So. 3d at 948. After significant redistricting, Stone decided to move to Holly Springs and began renting a house there. *Id.* Stone did not sell his Ashland house and planned on using it as a rental property. *Id.* at 949. Even so, this Court found that Stone had established his domicile in Holly Springs. *Id.* at 955. We agree that Gunasekara was not required to sell her D.C. home in order to establish a new domicile. The trial judge, however, did not find otherwise. Therefore, this argument lends no support to Gunasekara's contention that the trial judge applied the wrong legal standard.

2019, when renovations on the Decatur house were finished, and Gunasekara moved her family and belongings into the house.

¶40. This Court recently discussed the requirements for domicile, stating:

> "A domicile continues until another is acquired; before a domicile can be considered lost or changed, a new domicile must be acquired by removal to a new locality with the intent to remain there, and the old must be abandoned without intent to return thereto." "[T]he exercise of political rights, admissions, declarations, the acts of purchasing a home and long-continued residency are circumstances indicative of his intention to abandon his domicile of origin and to establish a new domicile."

*Meredith*, 340 So. 3d at 324-25 (alteration in original) (citations omitted). This Court has also held that

> The determination of a person's "permanent home and principal establishment" *turns on actual proof of a person's living arrangements*. It is not satisfied with a *simple declaration* that one intends to be a resident of a particular county when the overwhelming proof shows that he actually resides elsewhere. It is not enough that [the candidate] considers himself an official resident of [the state]. He must actually reside there permanently.

*Bryant v. Westbrooks*, 99 So. 3d 128, 133 (Miss. 2012) (first alteration in original) (quoting *Young*, 968 So. 2d at 1264). Therefore, Barton correctly argues that removal to the new locality and actual residency is required to change a person's domicile. Yet owning and moving into a house is not required. Gunasekara could have established removal to Mississippi and actual residency while living in her parents' house before the Decatur house was finished. As the trial court stated, "[i]t is clear that [Gunasekara] did, in fact, relocate and change her citizenship to the State of Mississippi at some point shortly after November 7, 2018." The trial court found, however, that Gunasekara had not changed her citizenship on

18

or before November 7, 2018, the date on which she was required to have been a citizen of Mississippi in order to qualify as a Public Service Commission candidate.

¶41.     The record shows that on November 7, 2018, Gunasekara owned a house in D.C., where her husband and children resided, and on which she received a homestead deduction. Gunasekara paid income taxes in D.C. She had a full time job in D.C., had a D.C. driver's license, and was registered to vote in D.C. Gunasekara renewed her car tag in D.C. at the end of October 2018. Moreover, the day before Gunasekara was required to have been a citizen of Mississippi, she exercised her right to vote in D.C. Although Gunasekara testified that she had started working with a contractor to make renovations to the Decatur house and that she began commuting between Mississippi and D.C., the trial court found that a "plethora" of evidence supported its determination that Gunasekara's domicile remained in D.C. on November 7, 2018. As the *Hale* Court stated, "[n]ot one of the facts upon which [the candidate] relies . . . renders the [trial court's] decision to have been manifestly erroneous." *Hale*, 168 So. 3d at 953.

### C.     Voting

¶42.     Gunasekara next argues that the trial court improperly treated her vote in the D.C. election on November 6 as a determinative factor in its analysis. Gunasekara concedes that the exercise of political rights is a factor in determining domicile; however, she argues that voting is not more determinative than any other factor.

¶43.     Gunasekara again points to *Hale*, in which Stone, the candidate, had registered to vote

19

in Marshall County approximately five months after he was required to have established residency in that county. *Hale*, 168 So. 3d at 949. This Court affirmed the decision of the trial court that Stone had established domicile in Marshall County in 2013. *Id.* at 956. Gunasekara argues that the trial court departed from this Court's precedent. Yet, unlike in this case, in *Hale*, no evidence was presented that Stone had chosen to exercise his right to vote in Benton County after he began renting a house in Marshall County. *Id.* at 949.

¶44. Here, the trial court did not consider Gunasekara's vote as the sole determinative factor in its analysis. It found that, along with the plethora of evidence presented, the exercise of her right to vote was a clear expression of her declaration of citizenship. As Gunasekara concedes, this Court has repeatedly held that voting is a factor in determining domicile. *See Hale*, 168 So. 3d at 952. Therefore, the trial court did not err by factoring into its decision Gunasekara's decision to vote in D.C. the day before she was required to have been a citizen of Mississippi.

¶45. In summary, we find that the trial court applied the appropriate legal standard in its analysis and that its findings of fact contained no manifest error. Moreover, the trial court's findings are supported by the evidence.

## II. Whether the trial court's determination that Gunasekara did not meet the citizenship requirement conflicts with this Court's decision in *Hale v. State Democratic Executive Committee.*

¶46. Gunasekara argues that the *Hale* case is precedential and that an adherence to *Hale* requires reversal. As previously discussed, in *Hale*, Stone had been a senator and long-time

resident of Benton County. ***Hale***, 168 So. 3d at 948. After significant redistricting, Stone decided to seek a November 2015 Democratic Party nomination for a newly created Senate district, which encompassed parts of Marshall County. ***Id.*** In order to qualify, Stone was required to have been domiciled in Marshall County for two years prior to the election. ***Id.*** So, in October 2013, Stone began to rent a house in Holly Springs, Marshall County, from his brother. ***Id.*** at 949. The state senate was in session in Jackson for the majority of the time Stone resided at the rental house. ***Id.***

¶47.    This Court found that Stone had "provided an abundance of evidence" to show that he had changed his domicile to Marshall County. ***Id.*** at 951. It recounted that after Stone had begun renting the Holly Springs house in October 2013, he had immediately contacted the utility department to obtain electricity. ***Id.*** The Court discussed that he had notified the state senate comptroller of his change of address on October 27, 2013, and that the comptroller had sent an email to every member of the senate to inform them of the change. ***Id.*** The Court stated, "[s]ignificantly, he canceled his homestead exemption for his Ashland residence in Benton County, did not claim homestead exemption anywhere in 2014 while he was renting the house . . . in Marshall County, and claimed homestead exemption in 2015" for the home that he purchased in Holly Springs. ***Id.***

¶48.    The Court noted that Stone had  registered car tags in Marshall County when they came due in February 2014 and September 2014 and that he registered to vote in Marshall County in April 2014. ***Id.*** He changed his address on his income tax filings in 2014 and

21

adjusted his mileage deduction. *Id.* The Court wrote that Stone had "altered major aspects of his life, including the church he attended, to Marshall County." *Id.* Stone had also resigned as an Ashland volunteer firefighter and allowed his Ashland Civic Club membership to lapse. *Id.* at 952. The Court found probative that Stone had bought a house in Holly Springs in July 2014. *Id.* Lastly, the Court cited Stone's testimony and that he had stated "under oath and without contradiction that he moved to Marshall County with the intent to remain there indefinitely." *Id.*

¶49.    The *Hale* Court noted that

> "[T]here is a strong but rebuttable presumption of residency in the county where the homestead exemption is filed."
>
> . . . .
>
> Although canceling one's homestead exemption does not give rise to a rebuttable presumption regarding his or her domicile, it can provide relevant circumstantial evidence of a person's intention to establish a new domicile, which should be considered along with the other relevant facts and circumstances of the case.

*Id.* (citation omitted). Therefore, the Court found that "[f]rom the point in time at which he filed for homestead exemption in Marshall County, Stone enjoyed a rebuttable presumption that his domicile was in Marshall County." *Id.* (citing *Hinds Cnty. Election Comm'n v. Brinston*, 671 So. 2d 667, 669 (Miss. 1996)).

¶50.    The Court also wrote about the importance of one's intent in establishing domicile. *Id.* It stated:

> This Court has held that "intention may be established by physical presence,

22

declaration of intent, and all relevant facts and circumstances, and in this connection it has been held that the *declarations of the party himself are most important.*" Our precedent dictates that Stone's statements of intention regarding his domicile are critical to our analysis, and thus we are bound to consider that Stone testified under oath that he intended to abandon his home in Ashland for the purpose of establishing a residence in Holly Springs and remaining there indefinitely.

*Id.* at 952-53 (citations omitted). This Court further discussed that the "exercise of political rights, admissions, declarations, the acts of purchasing a home and long-continued residency are circumstances indicative of his intention to abandon his domicile of origin and to establish a new domicile." *Id.* at 953 (internal quotation mark omitted) (quoting ***Johnson v. Johnson***, 191 So. 2d 840, 842 (Miss. 1996)). Thus, the Court again emphasized that all factors are taken into consideration when determining domicile. *Id.*

¶51. Gunasekara argues that, like Stone, she continued to maintain her former residence but not as her permanent home. She again points out that Stone also was registered to vote in his former county for a brief time during the relevant period. Yet, as Barton argues, ***Hale*** can be distinguished from the instant case. In ***Hale***, minimal evidence was cited regarding Stone's connection with his Benton County house after he began renting a house in Marshall County. Here, by contrast, Gunasekara spent the majority of her time at her D.C. residence. While Stone remained registered to vote in Benton County for a brief time after November 2018, Gunasekara actually exercised her right to vote in D.C. on November 6, 2018.

¶52. Unlike Stone, when Gunasekara's car tag became due on October 23, 2018, she registered her tag in D.C. Gunasekara also received a homestead deduction on her D.C. house

23

in 2018, 2019, 2020, and 2021. While we acknowledge Gunasekara's testimony that the homestead deduction was received by inadvertent mistake, the record indicates that no efforts were undertaken to correct this inadvertent mistake until 2023, after the property was sold. When the facts are taken as a whole, Gunasekara was not entitled to the same rebuttable presumption that she had changed her domicile.

¶53. "It is the candidate's burden to prove that she meets the residency requirement." *Westbrooks*, 99 So. 3d at 133 (citing *Edwards v. Stevens*, 963 So. 2d 1108, 1110 (Miss. 2007)). Taking all factors into consideration, the trial court did not commit manifest error by holding that Gunasekara's domicile remained in D.C. until some point after November 7, 2018. Accordingly, we affirm the decision of the trial court.

### III. Whether the trial court's application of the five-year citizenship requirement violates the Fourteenth Amendment of the United States Constitution.

¶54. Lastly, Gunasekara argues that the trial court's application of the five-year citizenship requirement in this case violates the Fourteenth Amendment. Gunasekara states that she is not challenging the constitutionality of the five-year residency requirement as a whole, but only "[w]hether the trial court's application of the five-year durational-citizenship requirement in this case violates the Fourteenth Amendment."

¶55. Under Mississippi Rule of Civil Procedure 24(d), when the constitutionality of a statute is challenged, the Attorney General of the State of Mississippi must be notified "within such time as to afford him an opportunity to intervene and argue the question of constitutionality." M.R.C.P. 24(d). Mississippi Rule of Civil Procedure 81(a)(4), however,

24

provides that the Mississippi Rules of Civil Procedure "apply to all civil proceedings but are subject to limited applicability in the following actions which are generally governed by statutory procedures . . . (4) proceedings pertaining to election contests . . . ." M.R.C.P. 81(a)(4). Even so, this Court previously has declined to address the constitutionality of a statute in an election contest pursuant to Rule 24(d). *See **James v. Westbrooks***, 275 So. 3d 62, 66 (Miss. 2019).

¶56.    Although Gunasekara argues that she is attacking the constitutionality of the statute as it was applied in this case, Gunasekara's arguments attack the five-year residency requirement as a whole. Resolution of this issue is of broad public importance. Accordingly, as a matter of public policy, the attorney general should be given an opportunity to argue the question of constitutionality. Therefore, we decline to address the issue at this time.

## CONCLUSION

¶57.    The trial court did not manifestly err by finding that Gunasekara was unable to meet the five-year residency requirement in order to qualify for the office of Public Service Commission. Therefore, we affirm the judgment of the Hinds County Circuit Court.

¶58.    Given the necessity for an expedited and final disposition of the instant appeal, under this Court's authority to suspend the rules pursuant to Mississippi Rule of Appellate Procedure 2(c), the Court finds that no motion for rehearing will be allowed and that this opinion shall be deemed final in all respects. The Court finds that the mandate in this matter should issue immediately.

25

¶59. The Clerk of this Court is directed to send copies of this opinion to the Mississippi Republican Executive Committee and to the Secretary of State.

¶60. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. COLEMAN, MAXWELL AND CHAMBERLIN, JJ., NOT PARTICIPATING.**